THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHILTON DePUE II, Defendant-Appellant.

Third District   No. 3—91—0521

Opinion filed May 29, 1992.

John L. Stainthorp, of Chicago, for appellant.

David W. Neal, State's Attorney, of Morris (John X. Breslin and Judith Z. Kelly, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE GORMAN delivered the opinion of the court:

Following a bench trial, the defendant, Chilton DePue II, was found guilty of felony theft (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(a)(2)(A)). The trial court subsequently sentenced him to serve 30 months' probation, perform 300 hours of community service, and pay $2,000 in restitution. He appeals.

The defendant argues on appeal that he was not identified beyond a reasonable doubt as the perpetrator of the crime. He notes that there were inconsistencies between the victim's testimony at a pretrial hearing on a motion to quash arrest and suppress identification and his testimony at trial. He further notes that a second witness, Michelle Ultis, also had inconsistencies between her testimony at the pretrial hearing and at trial. Taking into account these inconsistencies, the defendant contends that the identification testimony was simply too weak to support a conviction.

In the following factual summary, we have included the relevant testimony from the suppression hearing at the points where it differs from the testimony given at trial. Except where noted, the evidence from the suppression hearing was properly brought out at trial during cross-examination.

The record shows that 78-year-old John Severson was the victim of a scam in which a team of con artists stole $2,000 from him. At trial, Severson testified that on the morning of May 24, 1990, he received a phone call from a man who identified himself as "Mr. Miller" and claimed he worked at the bank where Severson had an account. "Miller" told Severson that he was investigating wrongdoing at the bank. He asked Severson to help him by withdrawing $2,000 from the bank, taking it home, and waiting for a bank security guard to come and pick it up. Severson complied with "Miller's" request. When Severson returned home from the bank, the telephone was ringing. It was "Miller" again. He asked Severson to read the first three serial numbers of the currency he had obtained. As Severson was doing

this, his door bell rang and "Miller" said it was probably the security guard. Severson finished giving the numbers and then answered the door while "Miller" remained on the phone.

Severson opened the door, left the storm door shut, and asked the man his name. The man replied, "Mr. Wright." "Wright" remained at the door for about five minutes while Severson took an envelope from him, spoke with him, placed the $2,000 in the envelope, sealed it, wrote his name on it, and talked to him about meeting again at the bank. "Wright" then left without ever having come inside. Severson stated that this was his only visitor that day. Following "Wright's" departure, Severson continued his phone call with "Miller," who told him they would meet him at the bank the next week. A few days later, Severson called his bank and was told they had no one there named Miller.

Police officer Doug Hayes interviewed Severson about a week after the incident. Severson described "Wright" as 5 feet 9 inches, 160 pounds, and wearing a three piece suit and glasses.

Officer Tom Bednarik testified that he subsequently showed Severson six photographs arranged in a file folder. All the photographs were of men with mustaches and two were wearing suits. Bednarik testified that the defendant's photograph was number two. Severson said the suspect looked like numbers two and six, but more like two.

At the suppression hearing, Severson first testified that he was shown only four photographs and had picked number six as the offender. However, when shown a photograph of the defendant that the State's Attorney described as "clearer," Severson stated that he was the offender. Severson further testified that he thought he would be able to identify the offender if he saw him again. Although the defendant was present when Severson testified at the suppression hearing, Severson stated that he did not see the offender there that day.

At trial, Severson described the offender as a man in his fifties, a little under six feet tall, with brown hair that was not unusual and did not appear to be a wig. He was wearing a dark, navy blue suit, possibly a vest, and a dark tie. Severson was not sure whether the offender had a mustache. When asked if he saw the person who had come to his door in court, Severson responded, "Well, I—he doesn't look like him. *** I mean he might have had a mustache on him, and that would be the difference on him." Severson further stated that he was not paying close attention to the man who came to his door, did

not study him that well, and was more concerned with ascertaining his name.

Michelle Ultis, Severson's next-door neighbor, testified that upon learning that he had been the victim of a scam a week earlier, she contacted the police. She stated that on the day of the incident, she had been sitting outside her home, watching her two young daughters play, when she saw a stranger walking down the street towards her and Severson's homes. She kept a close eye on him since her daughters were playing near the street. As he passed in front of her home, Ultis' dog ran toward him and Ultis went to collar the dog. She reached out, collared her large dog and, from about two feet away, spoke directly to the man, apologizing for the dog's barking. He did not respond, but simply smiled and continued toward Severson's house.

The defendant notes on appeal that at the suppression hearing, Ultis testified that she watched the man until he "disappeared into [Severson's] house." At trial, she stated that she saw him go up Severson's front walk, and walk up the steps to Severson's front door. We find, however, that this alleged inconsistency was not brought out at trial.

Ultis described the man she saw as six feet tall with a large build and "a bigger stomach." He wore a blue sport coat, tan slacks, tennis shoes, a canvas hat with the brim down, and possibly rimless or wire-rimmed glasses. Ultis further testified that he had unusually long, very dark hair that looked like a wig. She initially thought he was a salesman because he was carrying a briefcase. As he came closer and she observed his strange combination of clothes, she decided he did not look like a salesman and she became leery because her children were out near the street. She identified the defendant as the man she had seen.

Officer Bednarik testified that he interviewed Ultis about two weeks after the incident. She described the offender as being in his early to mid 40's, heavyset, with thick dark hair, a mustache, a smirk, and wearing a suit. He did not recall her mentioning a hat. Within about 20 seconds of viewing his picture in a photo lineup, she positively identified the defendant as the man she had seen.

Dennis Neary, the police chief of Coal City, testified that on May 30, 1990, he investigated a scam very similar to the instant one, in which a telephone caller who had identified himself as "Mr. Miller" had induced an elderly man to withdraw $3,000 from the bank. The money had been picked up by a well-dressed man in his 40's wearing

a funny hat. The defendant's photograph was shown to the victim, who made no identification.

Glen Shumate, an insurance salesman, testified that he was a colleague of the defendant. He had written several insurance policies for Severson since 1986 or 1987 and had been to his house 12 to 14 times, including at least six times in the last year and a half. In January 1990, Shumate introduced the defendant to Severson at a McDonald's. They talked for about two minutes, and Shumate told Severson that if he were transferred, the defendant would be his insurance man. Shumate also testified that he and the defendant kept their files containing the names, addresses, and ages of their clients at their company office, and that the defendant would have had access to Shumate's files since they were not secret.

The defendant testified that he had been a very successful insurance salesman for about eight years. At the time of trial he was six feet tall and weighed 225 pounds. He denied any involvement in the instant offense. He stated that he had never been to Severson's home and had met him only once at a McDonald's. He also stated that he had been arrested and photographed in 1988 based on a complaint that he was misrepresenting himself as a person from medicare, but no criminal charges were filed against him. He noted that he formerly wore a mustache but had shaved it off in March or April of 1989.

The trial judge noted that he found Severson's testimony confused, because of his age or circumstances, and therefore did not attach much weight to it. He also noted, however, that he was satisfied with the identification of the defendant by Ultis, who was a disinterested State's witness. He then found the defendant guilty.

As noted, the defendant is contending on appeal that he was not proven guilty beyond a reasonable doubt. He asserts that he and the victim unequivocally testified that he was not the person at the victim's door and therefore the State's evidence was insufficient for a conviction.

It is well settled that a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. The relevant question for a reviewing court is whether, when the evidence is viewed in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 478 N.E.2d 267.) When evidence is merely conflicting, a court of review will not substitute its judgment for that of the trier of fact. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733.) A single witness' identification of the accused is suffi-

cient to sustain a conviction if the witness viewed the accused under circumstances permitting a positive identification. (*People v. Slim* (1989), 127 Ill. 2d 302, 537 N.E.2d 317.) The sufficiency of identification evidence is a question for the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact. *People v. Johnson* (1986), 114 Ill. 2d 170, 499 N.E.2d 1355.

Initially, we note that we disagree with the defendant's characterization of the victim's testimony as unequivocally stating that the defendant was not the man at his door. A careful reading of all of Severson's testimony reveals the following: At the suppression hearing, Severson initially testified that he viewed four photos and chose number six (which was not the defendant) as the offender. However, after viewing a clearer picture of the defendant, Severson stated that he was the offender. While Severson stated that he thought he would be able to identify the offender if he saw him again, he was unable to pick out the defendant that day. At trial, when asked if he saw the offender, Severson responded that the defendant did not look like him, but the mustache may have accounted for the difference. This is a far cry from unequivocally stating that the defendant was not the man Severson had seen at his door. A more accurate description of Severson's testimony was that he equivocally identified the defendant as the offender.

Additionally, Officer Bednarik testified that Severson had viewed six, not four, photographs and had said either number six or number two, but mostly number two (the defendant) looked like the offender.

Furthermore, Severson testified that he did not pay that much attention to the man at the door. This was understandable since, contrary to the defendant's assertions on appeal, we note that the scheme was designed to distract Severson. The phone was already ringing when Severson returned from the bank. As he was reading the requested serial numbers, the doorbell rang and "Miller" remained on the line waiting while Severson wrote his name on the envelope, placed the money inside, and turned it over to the "security guard," as he was requested to do.

Most importantly, Ultis' identification of the defendant, both from the photographic lineup and at trial, was very clear and unequivocal. Her attention was drawn to the defendant as soon as she saw him walking down the street. Because her young children were playing near the street, and because, as he approached, the defendant's manner of dress was odd, Ultis became leery. She had the opportunity to view him up close when she retrieved her barking dog and apologized.

We find there was ample reason to view her testimony as credible, as the trial court did.

Finally, we note that while there were discrepancies between Ultis' and Severson's descriptions of what the defendant looked like and wore, it is clear that discrepancies as to physical characteristics or type of clothing are not fatal, but simply affect the weight to be given identification testimony. (*People v. Holmes* (1990), 141 Ill. 2d 204, 565 N.E.2d 950.) Thus, the trial judge, as the trier of fact, was in the best position to judge the witnesses' demeanors and memories as they testified, and to determine the weight to be given their testimony. We find that he properly did so in the instant case.

In sum, viewing the evidence in the light most favorable to the prosecution, we hold that a rational trier of fact could conclude that it was the defendant who appeared at Severson's door and took his money.

The judgment of the circuit court of Grundy County is affirmed.

Affirmed.

HAASE and McCUSKEY, JJ., concur.